

JUDGE JONES

491-09/MEU/WJP
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
D/S NORDEN A/S
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
William J. Pallas, Esq.
Michael E. Unger, Esq.
Jan P. Gisholt, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

D/S NORDEN A/S,

Plaintiff,

-against-

09 CV

EXPRESS SEA TRANSPORT CORP.,

**VERIFIED COMPLAINT**

Defendant.

---------------------------------------------------------------x

Plaintiff, D/S NORDEN A/S ("NORDEN"), by its attorneys Freehill, Hogan and Mahar, LLP., as and for its Verified Complaint against Defendant EXPRESS SEA TRANSPORT CORP. ("ESTC") alleges as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331. Federal jurisdiction also exists because the action arises

under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

**THE PARTIES**

2. At all times material hereto, Plaintiff NORDEN was and still is a foreign business entity duly organized and existing under the laws of a foreign country with a principal place of business located at 52, Strandvejen, DK – 2900 Hellerup, Denmark.

3. At all times relevant hereto, Defendant ESTC was and still is a foreign business entity duly organized and existing under the laws of a foreign country, with a principal place of business located at 3 Iassonos Street, Piraeus 185 37, Greece.

**FACTS**

4. On or about November 18, 2006, Fairplay Maritime Limited, as registered Owner of the M/V KIND SEAS, chartered the vessel to Defendant ESTC.

5. On or about December 22, 2006, Defendant ESTC, as disponent owner, entered into Charterparty with Plaintiff NORDEN, as charterer, on an amended NYPE form, whereby NORDEN agreed to charter the M/V KIND SEAS for a period of 22/24 months, at charterer's option. A copy of the December 22, 2006 charter party is attached hereto as Exhibit A (hereinafter referred to as "the Charterparty").

6. The Charterparty provides for arbitration in London with English Law to apply.

7. Plaintiff NORDEN subsequently sub-chartered the M/V KIND SEAS to United Bulk Carriers International Navegacao of Madeira ("UBCINM"). UBCINM subsequently sub-chartered the vessel to Agrenco, who subsequently sub-chartered the

vessel to Cosco Bulk Carriers, who subsequently sub-chartered the vessel to TMT Company Ltd.

8.      During the course of a voyage from Rotterdam to New Orleans in June 2007, the M/V KIND SEAS suffered a breakdown of the vessel's main engine, which in turn necessitated extensive periods of repair, both while the vessel was at sea and subsequently at port, during which time Plaintiff NORDEN, as charterer, was deprived of the use of the vessel.

9.      During the period of these repairs, the vessel should have been deemed "off hire" pursuant to the terms and conditions of the applicable Charterparty, including, but not limited to, Clauses 15, 34 and 40.

10.     Plaintiff NORDEN has further incurred various expenses during the period the vessel should have been off hire, including the cost of bunkers, which are for the account of Defendant ESTC, as disponent owner, pursuant to the terms and conditions of the Charterparty.

11.     Plaintiff NORDEN has commenced arbitration against ESTC in London pursuant to the terms of the charter party, with the parties having appointed their respective arbitrators on December 20, 2007, and January 7, 2008.

12.     As a direct result of Defendant ESTC's breach of its obligations under the charter party, Plaintiff NORDEN has incurred total damages in the amount of US $959,291.81, consisting of reimbursement for hire and expenses incurred while the vessel was "off hire" as a result of the breakdown of the main engine. Plaintiff's damages are set forth in detail in the "Final Hire Statement", a copy of which is attached hereto as Exhibit B.

14. Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as an element of Plaintiff's claim.

15. Plaintiff estimates, as nearly as can presently be computed, that the legal expenses and costs of prosecuting its claims in London arbitration will be $250,000.00. Interest anticipated to be awarded on the principal sums now due to Plaintiff is estimated to be $121,343.30 (calculated at the rate of 6% per annum compounded quarterly for a period of 2 years, the estimated time for completion of the proceedings in London).

16. In summary, the items of damages for which Plaintiff brings this action seeking security are as follows:

1) Principal damages arising from the breach of the charter party in the amount of $959,291.81.
2) Interest on the above sum in the amount of $121,343.30;
3) Arbitration costs and legal fees in the amount of $250,000.00.

17. In all, the claim for which Plaintiff NORDEN sues in this action, as near as presently may be estimated, totals **US $1,330,635.11**, no part of which has been paid by Defendant ESTC. Plaintiff NORDEN specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure NORDEN.

**Request for Rule B Relief**

18. Upon information and belief, and after investigation, the Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or

will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire or any other assets of, belonging to, due or being transferred for the benefit of the said Defendant ESTC (collectively hereinafter, "ASSETS"), including but not limited to ASSETS as may be held, received or transferred in its name or for their benefit, at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

19.    The total amount to be attached pursuant to the calculations set forth above is **US $1,330,635.11**.

WHEREFORE, Plaintiff D/S NORDEN A/S prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant citing them to appear and answer the foregoing, failing which default may be taken against them;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B all tangible or intangible property of Defendant up to and including the sum of **US $1,330,635.11** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due, held or being transferred to or for the benefit of Defendant, at, moving through or being transferred and/or wired to or from banking

institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c. That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to an order compelling the Defendant to arbitrate and/or the recognition and enforcement of any award or judgment entered against the Defendant in the London arbitration proceedings; and

d. For such other, further and different relief, including attorneys' fees, interest, costs and disbursements, as this Court may deem just and proper.

Dated: New York, New York
August 5, 2009

FREEHILL, HOGAN & MAHAR, LLP
Attorneys for Plaintiff D/S NORDEN A/S

BY: ______________________________
William J. Pallas
Michael E. Unger
Jan P. Gisholt
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

**ATTORNEY VERIFICATION**

State of New York )
) ss.:
County of New York )

WILLIAM J. PALLAS, being duly sworn, deposes and says as follows:

1. I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

William J. Pallas

Sworn to before me this
5 day of August, 2009.

Notary Public
HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

# EXHIBIT A

CLARKSON HELLAS LTD.
95 Akti Miaouli, Piraeus 185 38
Tel: +30 210 4586700 FAX: +30 210 4586799

# Time Charter

FIRST ORIGINAL

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

**This Charter Party,** made and concluded in *Athens* ... *22nd* day of *December 2006* ~~19~~

Between *Express Sea Transport Corp., Panama.* *as disponent* ... of *built 1999* Owners of the good *Marshall Islands flag* Steamship/Motorship ." *KIND SEAS* " ... ~~indicated horse power~~ of *37,689* ... tons gross register, and *34,199* tons net register, having engines of ... and with hull, machinery and equipment in a thoroughly efficient state, and classed *NKK* ... of about *3022808,96* cubic feet *grain* bale capacity, and about *72,493 metric* ~~tons of 2240 lbs.~~ at ~~... deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~ ~~allowing a minimum of fifty tons)~~ on a draft of *13,533 meters* ~~feet ... inches on~~ ... Summer freeboard, inclusive of permanent bunkers, which are of the capacity of about *as per Clause 29* ... tons of fuel, and capable of steaming, fully laden, under good weather conditions about *14* knots on a consumption of about *34,5 metric* tons of *IFO 380 CST no MGO at sea* ~~best Welsh coal—best grade fuel oil—best grade Diesel oil,~~ ~~now~~ *trading* ... and *D/S Norden A/S* ... Charterers of the City of *Copenhagen, Denmark*

**Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for about *22 / about 24 months exact period in Charterers' option (about means 15 days more or less in Charterers' option), trading always via safe port(s), safe berth(s), safe anchorage(s) in/out geographical rotation, always afloat, always within I.W.L. with lawful cargo and always via ice free ports and waters. Vessel never to be ordered to force ice neither to be required to follow ice breakers. NAABSA as per NYPE Clause 6 at Argentina, S.Brazil, Uruguay only.* within below mentioned trading limits. *See Clause 58.* Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for the fulfillment of this Charter Party.

Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot one safe port or passing following ranges, at any time, day or night, Sundays and holidays included: Singapore/S.Japan range, PMO/W.C.India range, Skaw/Passero including Black Sea, Tampa/Tampico range, Recife/Buenos Aires range. (Vessel presently undergoing change of Ownership and next voyage will be Yuzhny to China with iron ore).* ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her *arrival at first loadport* delivery to be ready to receive *Charterers'* cargo *(see also Clause 59)* with ~~clean-swept~~ *fresh water washed down holds free from rust scale and residues of previous cargoes* and tight, staunch, strong and in every way fitted for the service, *should the vessel fail inspection the vessel to be placed off-hire pro rata to the holds rejected from the moment of rejection until she passes re-inspection and bunkers consumed during this period and any directly proven additional expenses to be for Owners' account* having water ballast, ~~winches and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same time~~ (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchandise, ~~including petroleum or its products, in proper containers,~~ excluding *See Clause 59* ... ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk, all necessary fittings and other requirements to be for account of Charterers),~~ in such lawful trades, between safe port ~~and/or ports in British North America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or Mexico, and/or South America ... and/or Europe and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~ *safe berth(s), safe anchorage(s), always afloat except NAABSA as per Clause 6 always within Institute Warranty Limits Cargo to be loaded according to IMO regulations - see also Clause 55 and 58* ...

as the Charterers or their Agents shall direct, on the following conditions:

1\. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew, *and all other charges related to the Master officers and crew* shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water *also for garbage removal unless compulsory, lubricating oil* and maintain her class and keep the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

2\. That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *necessary and customary* Pilotages, *(Pilotage for Skaw (Spodsbjerg-Graena), Bosphorus and Dardanelles, Torres Strait, Great Belt, Magellan, Nullal Strait, Kanmon, Kulkyo Strait to be for Charterers' account),* Agencies, Commissions, Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~



*and any cargo battens that may be required* also any extra fittings requisite for a special trade or unusual cargo, but
Charterers are to provide necessary dunnage and shifting boards, Charterers to have the privilege of using shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards Owners to allow them the use of any dunnage and shifting boards already aboard vessel, Charterers making good any damage thereto.
for dunnage, they making good any damage thereto.

3\. *See Clause 43.* That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ... tons and not more than ... tons and to be re-delivered with not less than ... tons and not more than ... tons.

4\. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 25,500 daily including overtime payable every 15 days in advance* ... United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on ... summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a day; month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot one safe port or passing following ranges in Charterers' option: Aden/Passing Muscat/Japan range, Skaw/Passero range including full Mediterranean and Black Sea, Boston/Bahia Blanca range including U.S.Gulf-N.C. South America-Caribs, Vancouver/Callao range or Cape Town/Gibraltar range or Mombasa/Cape Town range* unless otherwise mutually agreed. Charterers are to give Owners not less than *See Clause 60* days notice of vessels expected date of re-delivery, and probable port. *See Clause 60.*

5\. Payment of said hire *less address commission* to be made in New York *(See Clause 30)* in cash in United States Currency, *every 15 days* semi-monthly in advance, and for the last *15 days* half-month or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count *as from vessel's delivery* ~~from 7 a.m. on the working day following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~

Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

6\. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe anchorage* place that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *at Argentina, S.Brazil, Uruguay only* where it is customary for similar size *and type* vessels to safely lie aground.

7\. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, *equipment* tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers paying Owners ... per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

8\. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim *lash secure dunnage and discharge* the cargo at their expense under the supervision of the Captain, who is to sign *or is to authorize Charterers to sign* Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

9\. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10\. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *under his own risk and always prior to his boarding to sign and deliver to vessel's Master Owners' relevant L.O.I.* and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of ~~\$1.00~~ *USD 20,00* per day. *Charterers to pay Owners USD 1,250 per month pro rata - payable every 15 days in advance for cables/victualling/entertainment.* ~~Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling.~~

11\. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log *in English* of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the consumption of fuel. *Charterers are to provide their own forms for Master to complete as per Charterers' instructions.*

12\. That the Captain shall use diligence in caring for the *natural* ventilation of the cargo. ~~That the Charterers shall have the option of continuing this charter for a further period of~~

13\. ~~That the Charterers shall have the option of continuing this charter for a further period of ... days previous to the expiration of the first-named term, or any declared option ... on giving written notice thereof to the Owners or their Agents ...~~

14\. That if required by Charterers, time not to commence before *00:01 hours local time 20th January 2007* and should vessel not have given written notice of readiness on or before *24:00 hours local time 5th March 2007* ~~but not later than 4 p.m.~~ Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

15\. That in the event of the loss of time from deficiency *sickness, strike, accident or default of Master officers or crew or deficiency* of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause



preventing the full *use of the vessel to the Charterer* ~~working of the vessel~~, the payment of hire shall cease for the time thereby lost; *and all directly related proven extra expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account* and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire *provided always the reason that resulted in any of the above events is not due to an act or default or omission of the Charterers, their servants or agents whether by way of negligence or otherwise*

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property. *In case of property, Owners and Charterers to share equally return of salvage.*

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *See Clause 73* ~~three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

18. That the Owners shall have a lien upon all cargoes, and all sub-freights, *sub-hires* for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to Rules ~~1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~ York-Antwerp Rules ~~1924~~ *1992 and latest amendments*, ~~at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money.~~

~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers.~~

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *Hire not to contribute to General Average.*

20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.

21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide *free of expense, sufficient electric lighting with vessel's lights as on board, light clusters to permit work at hatches and overboard at the same time* ~~on the vessel lanterns and oil for night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~ Charterers to have the use of any gear on board the vessel.

23. Vessel to work night and day, if required by Charterers, ~~and all winches to be at Charterers' disposal during loading and discharging; steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned thereby.~~

24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels; etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder:~~

~~U.S.A. Clause Paramount~~

~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

~~Both-to-Blame Collision Clause~~

~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~



~~the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.~~

25 The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging. *Vessel never to be ordered to force ice neither to follow ice breakers.*

26 Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, *her seaworthiness and maintenance, acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.

27 A commission of ~~2-1/2~~ *1.25* per cent is payable by the Vessel and Owners to *Clarkson Hellas Ltd., Hellas* on the hire earned *if applicable* and paid under this Charter, and also upon any continuation or extension of this Charter.

28 An address commission of ~~2-1/2~~ *3.75* per cent payable to *Charterers* on hire earned and paid under this Charter.

*Clauses 29 to 102 inclusive, as attached hereto, are deemed to be fully incorporated into this Charter Party.*

*OWNERS*

BY AUTHORITY OF DISP OWNERS

FOR AND ON BEHALF OF
CURZON MARITIME LTD
AS AGENTS ONLY

*CHARTERERS*

Alex Christiansen
General Manager
Dampskibsselskabet »NORDEN« A/S

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U S A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.



RIDER CLAUSES TO M.V. "KIND SEAS"
CHARTER PARTY DATED 22ND DECEMBER 2006

Clause 29 – Vessel's Description
M/V 'KIND SEAS' - EX MILTIADIS II

A) SPECIFICATION

1 VESSEL TYPE AND NUMBER OF DECKS: GEARLESS BULKCARRIER SINGLE DECK
2 DWAT SUMMER/WINTER/FRESH/TROPICAL/TROPICAL FRESH: 72493/70618/72491/74369/74332 MT
3 DRAFT SUMMER/WINTER/FRESH/TROPICAL/TROPICAL FRESH: 13,533/13,271/13,863/13,835/14,145 M
4 DWAT AT FOLLOWING DRAFTS:

| | SALT | FRESH | BRACKISH |
|---|---|---|---|
| 40 FT | 63507 MT | 61710 MT | 62608 MT |
| 41 FT | 65501 MT | 63656 MT | 64578 MT |
| 42 FT | 67508 MT | 65614 MT | 66561 MT |
| 43 FT | 69525 MT | 67581 MT | 68553 MT |
| 44 FT | 71549 MT | 69556 MT | 70553 MT |

5 TPC/TPI: 66,60/169,164 MT AT SUMMER DRAFT
6 FWA: 31 CM
7 GT/NT (1969): 37689/24199
8 SUEZ GT/NT: 38972,0/36318,30
9 PANAMA GT/NT: 124842 CBM/31186
10 LOA/LBP/BEAM/DEPTH MOULDED: 224,94/217,71/32,2/18,7 M
11 NUMBER HOLDS/HATCHES: 7/7
12 HATCH DIMENSIONS:
NO 1 13,04 X 12,8 M
NO 2,3,5,6,7 17,93 X 14,4 M
NO 4 16,30 X 14,4 M
13 HOLD DIMENSIONS (L X W ON TANKTOP X H MAX HEIGHT FM TANKTOP TO UNDERSIDE OF THE DECK BEAMS, EXCLUDING CORRUGATIONS AND SLOPES):
NO 1 21,3 X FWD 10,2/23,8 AFT X 16,4 M
NO 2 24,6 X 23,8 X 16,4 M
NO 3 24,6 X 23,8 X 16,4 M
NO 4 22,1 X 23,8 X 16,4 M
NO 5 24,6 X 23,8 X 16,4 M
NO 6 24,6 X 23,8 X 16,4 M
NO 7 22,8 X FWD 23,6/8,2 AFT X 16,0 M
14 TOTAL CUBIC CAPACITY - GRAIN: 85595,61 CBM/3022808,96 CFT
15 CUBIC BREAKDOWN BY HOLDS - GRAIN:
NO 1 9974,98 CBM ( 352266,42 CFT)
NO 2 13116,35 ' ( 463203,90 ')
NO 3 13046,89 ' ( 460750,92 ')
NO 4 11847,98 ' ( 418411,41 ')
NO 5 13130,14 ' ( 463690,89 ')
NO 6 13129,56 ' ( 463670,41 ')
NO 7 11349,71 ' ( 400815,01 ')

TOTAL GRAIN: 85595,61 CBM (3022808,96 CFT)
16 CARGO GEAR: GEARLESS
17 GEAR DISTRIBUTION: N/A
18 GRABS FITTED: N/A



**RIDER CLAUSES TO M.V. "KIND SEAS"**
**CHARTER PARTY DATED 22ND DECEMBER 2006**

19 HATCH COVER TYPE: SIDE ROLLING
20 STRENGTHS: TANKTOPS HOLD NO 1 29,00 MT/SQM
' HOLDS NO 2,4,6 15,60 '
' ' NO 3,5,7 27,20 '
HATCH COVERS NO 1 2,08 MT/SQM
' ' NO 2,3,4,5,6,7 1,75 '
21 WING TANKS FITTED: YES
HOPPER TANKS FITTED: YES
22 DISTANCE SHIPS RAIL/TO OUTSIDE OF HATCH COAMING:
HATCH NO 1 7,0 M (FORE) 8,12 M (MID) 8,8 M (AFT)
' NO 2,3,4,5,6 8,4 M ( ') 8,40 M (') 8,4 M (')
' NO 7 8,4 M ( ') 8,40 M (') 8,2 M (')
23 DISTANCE WATER LINE/HATCH COAMING:

| | BALLAST (HEAVY) | (NORMAL) | LIGHT CONDITION | LADEN (EVEN KEEL) |
|---|---|---|---|---|
| NO 1 HATCH | 14,97 M | - M | 21,38 M | 8,81 M |
| NO 4 HATCH | 13,73 M | - M | 19,48 M | 7,84 M |
| NO 7 HATCH | 13,46 M | - M | 18,52 M | 7,84 M |

PROVIDING THAT HATCH COVERS WILL BE OPEN IN ALL STAGES
24 LAKES FITTED AND DWAT: NO
25 AUSTRALIAN HOLD LADDERS FITTED: YES
26 SUEZ AND PANAMA CANAL FITTED: YES
PANAMA CANAL DWT (39'06" TFW): 60535 MT
27 ICE STRENGTHENED: NO
28. CARGO BATTENS: NO
29 SATELLITE COMMUNICATIONS ON BOARD: REVERTING
30 GRAB DISCHARGE SUITABLE: YES
31 GRAIN FITTED: YES
32 CO2 FITTED IN HOLDS: NO
33 HAS VESSEL A CLOSED SEWAGE SYSTEM: TREATMENT PLANT
34. YEAR/MONTH/WHERE BUILT: 1999/DECEMBER/JAPAN
35. FLAG: MARSHALL ISLANDS
36 PORT OF REGISTRY: MAJURO
37 REGISTER NUMBER: REVERTING
IMO NUMBER: 9205847
38 CLASS/MARK/NUMBER: NKK/NS BULK CARRIER ESP MNS/9205847
39 VENTILATION: NATURAL
40 LOG FITTINGS: NO
41. STANCHIONS: NO
42 CONTAINER CAPACITY AND FITTINGS: NO
43. E/B LOCATED: AFT
44 ANY CENTRE LINE BULK HEAD/PILLARS/OTHER OBSTRUCTIONS: NO
45 STRENGTHENED FOR HEAVY CARGOES WITH ALTERNATE HOLD LOADING:
YES, CARGO HOLD NO 2,4 AND 6 MAY BE EMPTY
46 AIR DRAFT: LIGHT, DISTANCE SEA TO HIGHEST POINT 44,23 M
BALLAST-NORMAL, DISTANCE SEA TO HIGHEST POINT 40,92 M
BALLAST-HEAVY, DISTANCE SEA TO HIGHEST POINT 39,80 M
LADEN, DISTANCE SEA TO HIGHEST POINT 34,07 M
DISTANCE KEEL TO HIGHEST POINT 47,60 M
47 EX NAMES/DATE OF LAST NAME CHANGE: MILTIADIS II/DEC 06



RIDER CLAUSES TO M.V. "KIND SEAS"
CHARTER PARTY DATED 22ND DECEMBER 2006

B) SPEED AND CONSUMPTION

1 AVERAGE SPEED: 14 KNOTS
AVERAGE SPEED AND CONSUMPTION IS GIVEN FOR GOOD WEATHER CONDITIONS UPTO BEAUFORT SCALE 4 AND DOUGLAS SEA STATE 3
2 AVERAGE CONSUMPTION AT SEA: IFO 380 CST 34,5 MT - NO MGO
WHEN MAIN ENGINE STARTING/STOPPING, MANOEUVRING, NAVIGATING SHALLOW OR CONFINED WATERS, ENTERING AND SAILING PORTS, RIVERS AND LAKES VESSEL BURNS MGO IN MAIN ENGINE
3 IN PORT CONSUMPTION: IFO 380 CST 3,5 MT
4 IFO AND MGO SPECIFICATION: IFO 380 CST - RMO 35, ISO 8217 1996
MGO - DMA, ISO 8217 1996

5 MAIN ENGINE TYPE: SULZER 6RTA62
6 BHP/RPM (85 PCT): 11815 PS/92,8 RPM
7 GENERATOR NUMBER/TYPES/BHP/RPM: 3/YANMAR 6N18L-8N/680 PS OR 500 KW/720 RPM

C) CAPACITIES

1 IFO CAPACITY: 2610,29 CBM (85 PCT)
2 MGO CAPACITY: 138,76 CBM (85 PCT)
3 FW CAPACITY: 292,89 MT (100 PCT)
4 UNPUMPABLE BUNKERS: IFO 90 MT/MGO 15 MT
5 BALLAST CAPACITY: NORMAL 20054,71 CBM, HEAVY 31902,69 CBM (INCLUDING HOLD NO 4,)
6 DAILY FW CONSUMPTION: 10 MT
7 EVAPORATOR AND OUTPUT: 14 MT/DAY
8 CONSTANTS EXCLUDING FRESH WATER: 350 MT
CONSTANTS INCLUDING MINIMUM FRESH WATER: 500 MT

ALL DETAILS ABOUT

Clause 30 – Hire Payment
Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank account, details as below. Charterers will not agree to the assignment of hire, monies due under this Charter Party, or the Charter Party itself in any circumstances whatsoever

ALPHA BANK AE
PIRAEUS SHIPPING BRANCH
89 AKTI MIAOULI STREET
PIRAEUS, GREECE
TEL NO: +30 210 4290208, FAX NO: +30 210 4290348

IBAN NO: GR36 0140 9600 9600 1500 6007 550
SWIFT NO: CRBAGRAA
A/C NO: 960-01-500600-7550
IN FAVOUR OF: EXPRESS SEA TRANSPORT CORP
REFERENCE: NORDEN - C/P 22 12 06



RIDER CLAUSES TO M.V. "KIND SEAS"
CHARTER PARTY DATED 22ND DECEMBER 2006

USD CORRESPONDENT: JP MORGAN CHASE BANK
1, CHASE MANHATTAN PLAZA
NEW YORK, N Y 10081 USA
SWIFT NO: CHASUS33XXX
A/C NO: 001-1-366747

1st hire plus bunkers on board on delivery to be paid within 3 banking days after delivery

Clause 31
Referring to lines 60 and 61, where there is any failure to make "punctual and regular payment", due to oversight or negligence or error or omission of Charterers' employees, bankers or agents, Owners shall notify Charterers in writing whereupon Charterers will have three banking days to rectify the failure; where so rectified the payment shall stand as punctual and regular payment

Clause 32
Charterers to have the right to withhold from Charter hire, during the period of this Charter, such amounts due to off-hire and Owners' disbursements, but properly substantiated Charterers to have the right to withhold from last hire payments Owners' estimated advances and disbursements but max USD 500 per port, including any fines and any other accounts for Owners' account and also the value of the estimated quantity of bunkers on redelivery However, final accounting to be arranged by Charterers prompt possible However no any hire deduction will be made from Charterers without having Owners written agreement for Owners' expenses

Clause 33 – Boycott Clause
In the event of the vessel being boycotted by I.T.F., delayed or rendered inoperative by strikes, labour stoppages, or by any other difficulties due to vessel's flag, ownership, crew, terms of employment of officers or crew or any other vessel under the same ownership, operation or control, all time lost is to be considered as off-hire and expenses and liabilities incurred thereby to be for Owners' account.

Clause 34
Should the vessel be seized or detained by any authority, or arrested at the suit of any party having or purporting to have a claim against any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at Charterers' use and all extra directly related expenses and directly related actual losses which proved by Charterers shall be for Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their agents or their servants, or by reason of cargo carried

Clause 35
Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account if caused by Charterers or by Charterers' servants and to be for Owners' account if caused by Master, Officers, Crew or Owners' servants

Clause 36
Charterers to have the option to add any off-hire time to the Charter period to be declared 30 days prior to redelivery



## RIDER CLAUSES TO M.V. "KIND SEAS" CHARTER PARTY DATED 22ND DECEMBER 2006

Clause 37
Any delay, directly related expense or directly related loss by reason of non-compliance with regulations, lack of proper documentation or equipment as per Clause 29 and 46 to 50 or on any breach of said Clauses to be for Owners' account

Clause 38
Deleted

Clause 39
If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Owners to comply with Clause 50 or because of lack of said certificates, any time so actually lost shall be treated as off-hire and all extra proven expenses incurred, directly resulting from such failure, shall be for Owners' account

Clause 40
Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom All fuel used by the vessel while off-hire shall be for Owners' account.

Clause 41
If for any reason whatsoever the vessel will be off-hire or is reasonably estimated to be off-hire for 40 (forty) consecutive days, Charterers have the option to cancel the balance of this Charter Party

Clause 42
Hire as specified in line 51 to include among other operations, usually performed by the crew unless prohibited by shore regulations such as:

- opening and/or closing of hatches,
- watchmen in holds for supervision of loading and discharging,
- docking/undocking/shifting/ballasting and bunkering,
- shape up hatches/holds as much as possible prior to arrival at loading and/or discharging port/docks/anchorage, so that loading and/or discharging operations can commence immediately provided weather permits and provided such work can be safely done en route

Clause 43 – Bunkering Clause
Vessel to be delivered with bunkers as on board which expect to be about 1600-1800 metric tons IFO and about 40-60 metric tons MGO Charterers to redeliver the vessel with about same quantities as those actually on delivery, prices to apply both ends USD 340 per MT IFO and USD 613 per MT MGO Charterers to pay for bunkers on delivery together with first hire payment and Charterers to deduct value of redelivered bunkers from last sufficient hire payment(s)

Owners to have the option of bunkering the vessel for their own account provided same does not interfere with Charterers' operations

Charterers have the option to supply the following grade of bunkers at South Africa:
IFO 180cst RMF 25



**RIDER CLAUSES TO M.V. "KIND SEAS"**
**CHARTER PARTY DATED 22ND DECEMBER 2006**

Clause 44
Charterers have the privilege to bunker the vessel prior delivery, provided same does not interfere with Owners' operations

Clause 45
Owners warrant that vessel is eligible and equipped to bunker in the U S A., its territories and possessions and in all countries to which vessel is allowed to trade under this Charter

Clause 46 – Certificates – Warranties Clause
The Owners are to provide and keep on board valid Deratization Certificates throughout the Charter period Deratization shall always be for Owners' account

Clause 47
Throughout the period of the Charter, vessel to be in possession of all necessary valid equipment and certificates to comply with safety and health regulations, national and international regulations and all current requirements at all ports of call, Panama and Suez Canal included

Clause 48
For the carriage of grain in bulk, vessel to have on board throughout this Charter period valid documents and certificates issued by the Classification Society and International Authority International Grain Code (RES MSC 23(59)) on the basis of the SOLAS 1974 regulations and latest amendments thereto

Clause 49
Vessel to be fit for grab discharge and no cargo to be loaded in places inaccessible to grabs or deeptanks Charterers to have the privilege of using bulldozers in vessel's holds However, gross unit weight of bulldozers will not exceed vessel's tanktop strength

Clause 50
The Owners undertake that all equipment shall confirm with regulations in all ports visited by the vessel and that the vessel is at all time in possession of valid certificates to comply with such regulations

Clause 51
Owners warrant that the vessel has not traded Israel and is not blacklisted by Arab countries

Clause 52 – Insurance Clause
Owners shall maintain and carry on board a valid P and I Entry Certificate containing the oil pollution limitation of Cover Clause Owners by production of a Certificate of Insurance or otherwise shall satisfy the requirements of (a) Section 311 (p) of the United States Federal Pollution Control Act, as amended through 1978 (33 US Code Section 1321 (p), (b) Articles VII of the International Convention of Civil Liability for Oil Pollution Damage 1969 as far as applicable, (c) a valid and up-to-date Certificate for Financial Responsibility as required under the Oil Pollution Act 1990) Owners to remain responsible for all consequences that may occur including extra expenses and/or off-hire periods for the vessel as a result of not having such valid and up-to-date certificate on board at all times during the currency of this Charter



RIDER CLAUSES TO M.V. "KIND SEAS"
CHARTER PARTY DATED 22ND DECEMBER 2006

Clause 53
Deleted

Clause 54
Deleted

Clause 55
In the event of outbreak of war between any of the following countries:
United States of America, the country of vessel's flag, C I S , Communist China, United Kingdom, Japan, France, Germany, both Charterers and Owners have the option of cancelling this Charter Party without redress to either party

It is understood that war means direct war between these nations and does include local hostilities or civil war where any of the above countries support opposing sides

Owners shall not unreasonably take advantage of this clause in case of a limited local conflict
Neither Owners, nor Charterers shall unreasonably take advantage of this clause in case of a limited local conflict

Clause 56
Basic war risk insurance to be for Owners account. Any additional premium payable for trading to countries or waters or territories where an additional premium is payable to owners war risk underwriters to be for Charterers' account in accordance with war risk underwriters invoice less rebates/discounts/commissions, any crew war bonus including blocking and trapping to be for Charterers' account as well as repatriation expenses for crew not required to enter aforementioned territories
Vessel not required to call in countries or waters or territories where no war risk insurance obtainable from their underwriters

The Conwartime 1993 is deemed to be incorporated in this Charter Party and all Bills of Lading issued hereunder

Clause 57 – Bills of Lading/Cargo Claims
This Charter is subject to the New Jason Clause, New Both-to-Blame Collision Clause, Conwartime 1993 as attached, which are to be incorporated in all Bills of Lading issued under this Charter Above clauses as attached

All Bills of Lading issued under this Charter Party will incorporate the General Paramount Clauses as attached

No liner Bill(s) of Lading, no liner Waybills, no through and no combined transport Bill(s) of Lading to be issued under this Charter Party No Hamburg Rules or other legislation imposing liability more or above Hague-Visby Rules will be incorporated in the Bill(s) of Lading

Clause 58 – Trading Exclusion Clause
Vessel to trade always within I W L excluding:
Iceland, Cuba, Haiti, Syria, Turkish occupied Cyprus, Angola, Albania, Yugoslavia (but Croatia and Slovenia allowed), Sea of Azov, Somalia, Israel, Ethiopia, Eritrea, Liberia, Zaire, Cambodia , Cameroon, Republic of Congo, Gambia, Gabon, Guinea Bissau, Sierra Leone, Amazon (but allowed up to Itacotiara), Orinoco (but allowed up to Puerto Ordaz), North Korea, Cambodia, Myanmar, CIS Pacific ports, war and warlike zones



# RIDER CLAUSES TO M.V. "KIND SEAS" CHARTER PARTY DATED 22ND DECEMBER 2006

Lebanon ok provided no war hostilities at the time

Iraq ok with UN approved cargoes only

Vessel neither to follow an ice breaker nor to force ice

Vessel is not allowed to sail / trade directly between P R China and Taiwan and vice versa.

Clause 59 – Cargo Exclusions
aaa)
Following cargoes to be excluded:

Vessel to be employed in carrying lawful harmless merchandises only excluding:

Livestock, injurious, corrosive, inflammable or dangerous goods as defined by IMO (such as but not limited to): acids, explosives, black powder, blasting caps, bombs, ammunitions, dynamite, tnt, arms, aluminium dross, aluminium ferosilicon, aluminium nitrate, ammonium sulphate, asphalt, aluminium silicon, ammonium nitrate, ferrosilicon, fishmeal, hbl, dri, hide, fishscrap, fluorspar, iron briquette, iron oxide, iron sponge, lead nitrate, lime, radio active material and wastes, nuclear fuel / material / wastes, magnesium nitrate, copra ,caustic soda, coffee, cocoa, concentrates, calcium carbide, petroleum and its products, manure, pitch prill, prilled coal tar, pencil pitch, pond coal, potassium nitrate, sawdust, slag, silicomanganese, sodium nitrate, salt cakes, salt petre, tankage vanaadium, ore,nickel ore, woodchips, wood pulp pellets, zinc ashes / dross / residuces / skimming, asphalt hides, creosoted goods, calcium hyprochloride, motor blocks, turnings, logs, soda ash, caustic soda, sunflower seed expellers, naphta, granite blocks and other stone blocks, linseeds and its product, PKE, rice in bulk, rice bran, rape seeds, clay, bagged sugar , bagged rice, any cargoes which need CO2 and IMO Appendix B cargoes

Cargo always to be shipped, stowed, carried and discharged in accordance with local laws and national regulations and in compliance with IMO regulations and requirements.

Ammonium nitrate fertilizer grade allowed

Coal is always allowed provided no CO2 needed

Charterers to have the option to load iron ore, iron ore concentrates and iron ore pellets/fines provided that such cargoes will always be loaded/stowed/carried and discharged in strict accordance with IMO/IMDG/SOLAS/local and international regulations/recommendations at Charterers' time/risk and expense

All grain/grain products/agrigultural products allowed always excl sun flower seed expellers, bulk rice, but it is understood that soya beans/soya bean meals always allowed provided not requiring electrical ventilation and/or CO2 fitting in holds

Three (3) petcoke cargoes allowed (which not to be last) limited to the type of non hazardous, non dangerous, non oily green delayed type

Protective clause as below

Alumina is always allowed cargo but not as first cargo



## RIDER CLAUSES TO M.V. "KIND SEAS" CHARTER PARTY DATED 22ND DECEMBER 2006

Charterers to have the option to carry cargos of harmless, lawful zink, copper, lead concentrates during the entire period of c/p provided that same is loaded/stowed/carried/marked/lebelled and discharge at Charterers' time and expense and in strict accordance with IMO/IMDG/SOLAS regulations/recommendations

In case Charterers load any cargoes requiring DPC survey in Brazil, then the time and expenses for passing the survey to be for Owners' account

Charerers have the option to carry three (3) cargoes of sulphur during the entire period of the c/p provided that same is not carried as last cargo prior to redelivery

Charerers have the option to carry three (3) cargoes of salt during the entire period of the c/p provided that same is not carried as last cargo prior to redelivery

Salt/sulphur protective clause as below

Charerers have the option to carry three (3) cargoes of cement clinker during the entire period of the c/p provided that same is not carried as last cargo prior to redelivery-protective clause as below

Charerers have the option to carry three (3) cargnes of cement in bulk during the entire period of the c/p provided that same is not carried as last cargo prior to redelivery-protective clause as below

Charerers have the option to carry three (3) cargoes of non oily scrap excl motor blocks and turnings and radioactive during the entire period of the c/p provided that same is not carried as last cargo prior to redelivery

== Petcoke ==

a) Petroleum coke mentioned here in is only limited to the type of non-hazardous, non-dangerous, non-oily green delayed type

b) Such cargo to be loaded, stowed, trimmed, discharged strictly in accordance to latest IMO and/or any other latest regulations/rules applicable to such cargo

c) Should any additional/special wash down of holds before loading be reasonably recommended proposed required by master, Charterers undertake to arrange the same at their time/expense

d) After discharge Charterers to arrange at their expense/time of any additional/special washdown of holds carrying such cargo by chemical as Master reasonably considers it necessary Charterers are allowed to use ship's crew to performs cleaning as necessary against paying USD 850 per hold, but always subject to prior consent of master/crew and local regulations permit and all time so used to be for Charterers' account

e) Any directly related extra expenses resulting therefrom/incurred thereby (such as hold cleaning to master's satisfaction/hold survey etc) and any detention through any of the above causes to be for Charterers' account



**RIDER CLAUSES TO M.V. "KIND SEAS"**
**CHARTER PARTY DATED 22ND DECEMBER 2006**

== Pig iron ==

Charerers have the option to carry two cargos of pig iron during the entire period of the c/p provided that same is not carried as last cargo prior to redelivery

Pig iron protecting clause

a) Charterers undertake that loading of first layer of pig iron not to be released until lowered as close as possible to tank top and not to be dumped/dropped during loading, so as to provide a cushion flooring for the balance of cargo under the master's supervision and his reasonable satisfaction

b) Charterers undertake to supply onboard, at their expense, dunnage and/or other materials which master consider necessary to provide safe protection from damage by loading pig iron

c) In case during en route from loading to discharging port, cargo was found to shift which may affect the seaworthiness or safety of the vessel, owners have the right to call at nearest port for necessary cargo trim, all time/expenses incurred to be for Charterers' account and vessel to remain on hire for period

== Soft Scrap loading clause ==

Charterers are allowed to load two cargoes of scrap, only limited to iron and steel scrap/hms 1+2 and / or shredded scrap, non oily and always excluding motor blocks turnings, metal borings and cutting and non radioactive, under following conditions:

1 The scrap mentioned herein only limited to iron and steel scrap/hms 1+2 and / or shredded scrap specifically excluding motor blocks and turnings and also metal borings and cuttings

2 Charterers undertake that loading of first layer of scrap not to be released until touching tank top and not to be dumped / dropped during loading

If loading facilities cannot comply with the above provisions then the following soft landing clause to apply:

"Charterers undertake the first load of scrap in each hold to consist of lighter material (shredded / bushellings / wire rods or similar light material) and to be lowered as close as possible to the bottom of the hold so as to provide a proper flooring and cushion"

First layer of scrap to be loaded at height and to be evenly stowed / trimmed to satisfaction of Master before loading balance of cargo

3 Charterers undertake to supply on board, at their expense, dunnage and / or other materials which master considers necessary to provide safe protection on deck from damage by loading scrap

4 Prior loading scrap, hold condition survey to be conducted by an independent surveyor at and same to be done immediately after completion of discharge Time and expense to be for Owners account. In case of any damage to the vessel's hold and Australian hold ladders and any other parts / places affecting seaworthiness / cargo - worthiness and proper workability of the vessel caused by loading such scrap cargo, Charterers to be responsible for repairs to



## RIDER CLAUSES TO M.V. "KIND SEAS" CHARTER PARTY DATED 22ND DECEMBER 2006

bring hold and Australian hold ladders and other parts / places to same condition as prior to loading scrap

Before commencement of next voyage Other proven damages, if any, not affecting seaworthiness / cargo-worthiness and proper workability of the vessel to be dealt with in accordance with Clause 62

== For steel cargoes ==

- Pre-loading cargo survey clause

If finished steels unpacked manufacture goods newsprint or similar cargo is to be loaded Owners may arrange for pre-shipment and outturn survey of such cargo to ascertain its condition Such survey to be held by Owners' P+I Clubs reps

Surveyors' findings to be firmly inserted in the m/r and bsls
Cost of such survey to be for Owners' account Owners not to be responsible for stevedoring damages to the cargo Stevedores are always to be consider Charterers' servants

Charterers to undertake cleaning of holds including removal of dunnage at their time and expenses

No California n/o block stow allowed.

Cargo to be loaded always according to vessel's stronghts/tt strengths/stability

Charterers to arrange for all necessary dunnage and other material required for the proper and safe carriage of cargo

== Bulk cement/clinkers ==

a) Charterers undertake to use holds as less as possible, provided vessel's stability trim and stress permitting

b) Should any additional/special wash down of holds before loading be required/recommended by independent surveyors appointed by Charterers at their expense, such wash down to be arranged by Charterers at their expense

c) Charterers are allowed to use ship's crew to perform hold cleaning after completion of discharging paying USD 900 per hold, but always subject to prior consent of master/crew and local regulations permit and all time so used to be for Charterers' account

d) After loading Charterers undertake to arrange at their expense any special/extra trimming and/or levelling of cargo to Master's satisfaction and also Charterers to give reasonable time to allow for the cargo to settle and any air to escape before vessel's departure from loading berth/port

e) Such cargo not to be last cargo prior to redelivery

f) Any extra expenses resulting therefrom/incurred thereby and any detention through any of above causes to be for Charterers' account



RIDER CLAUSES TO M.V. "KIND SEAS"
CHARTER PARTY DATED 22ND DECEMBER 2006

g) Charterers have option to cut cement holes, if need, and reweld same at master's satisfaction

== Sulphur/Salt ==

a) Charterers undertake to use holds as few as possible, provided vessels stability and strengths permitting

b) Before loading, all holds assigned for sulphur to be lime-washed by Charterers at their time/risk/expense to the satisfaction of master and independent surveyors appointed by Charterers at their time and expense.

c) Cargo to be loaded/stowed/trimmed/discharged strictly according to latest IMO and/or any other latest regulations/rules applicable to such cargo

d) All freshwater used for irrigation onto sulphur during loading/voyage/discharging to be for Charterers' account

e) After discharge Charterers to supply sufficient fresh water at their expense for washing down of all holds

f) Any directly related extra expenses resulting therefrom/incurred thereby (such as hold cleaning to masters satisfaction/hold survey etc) and any detention through above causes to be for Charterers' account

g) Charterers are allowed to use ships crew to perform lime washing and removal of same and repainting as necessary against paying USD 900 per hold, but always subject to prior consent of master/crew and local regulations permitting, and all time use to be for Charterers' account

Max (13) dirty cargoes are allowed during this period
Dirty cargoes not to be consecutive
Dirty cargoes defined a sulphur/salt/scrap/cement/cement clinkers/petcoke

Owners not to be responsible for any contamination and/or damage to cargo which may arise due to mixed cargo loaded in same hold

No deck cargo allowed

Clause 60 – Redelivery Clause
Charterers to give Owners 20/15/10 days approximate and 5/3/1 day(s) definite notice of redelivery date and port

Clause 61
Deleted

Clause 62 – Stevedore Clause
Should any damage be caused to the vessel or her fittings by the stevedores, the Master shall notify same in writing to the responsible stevedores with copy to the Charterers and their agents at time of occurrence of the damage or as soon as possible thereafter but latest when the damage could have been discovered by the exercise of due diligence. The Master shall use his best efforts to have the damage repaired or made good by the stevedores without delay and



## RIDER CLAUSES TO M.V. "KIND SEAS" CHARTER PARTY DATED 22ND DECEMBER 2006

endeavour to obtain from the stevedores a written acknowledgement specifying the extent of the damage, unless the damage has been repaired or made good in the meantime Surveyor's report to be presented immediately to Charterers

If stevedores refuse to repair and settle or acknowledge the damage as aforesaid, the Master shall immediately request stevedores to attend a joint survey of the damage and advise Charterers and their agents accordingly about the result of the survey If stevedores refuse to attend the survey then Master has to arrange the survey by an independent surveyor at Charterers' time, expense, responsibility

Charterers to be responsible for damage (wear and tear excepted) caused by negligence of stevedores only if not repaired or made good by stevedores and provided Master has complied with instructions as aforesaid Charterers shall in addition reimburse Owners for the cost of the independent surveyor

Charterers have the option of redelivering vessel without repairing damage for which they are responsible unless such damage is affecting vessel's seaworthiness or normal working or trading of the vessel in which case should be repaired without delay after occurrence at Charterers' time to the satisfaction of vessel's class and should be paid by Charterers Owners agree that other damage for which Charterers are responsible may remain for occasional repair when the ship is to be docked for Owners' account so that Charterers to pay actual cost of repair but not time used

Clause 63 – Cargo Holds – Intermediate Hold Cleaning
Upon completion of discharge of each cargo if required by Charterers, vessel's crew shall render assistance in cleaning the holds, provided local labour regulations permit and weather permitting, against Charterers paying owners a net lumpsum of USD $500 per hold used for each intermediate cleaning In any case such cleaning is at Charterers' time and risk Owners not to be responsible for any delays

Such cleaning work shall be performed while vessel is en route to next loading port, provided that this can be safely done and that the duration of the voyage is sufficient
Crew will endeavour to effect such cleaning as best as possible but without guarantee that the cargo holds will be sufficiently cleaned and accepted on arrival at loading port and Owners shall not be responsible for any consequences arising from the fact that vessel's crew has been employed in cleaning. All fuel, chemical fresh water and consumable material used to be for Charterers' account

In case of petcoke, lumpsum USD 950 per hold.

<u>In lieu of hold cleaning</u>
USD 5,000 lumpsm including disposal/removal of dunnage/lashing materials/debris
If however the last discharging port prior to redelivery is a U S A port or one of it's territories the Charterers to arrange to collect, remove ashore and dispose ashore any dunnage/lashing materials/debris as per local laws and requirements at their time/risk and expense

Clause 64 – Ballasting Clause
Charterers have the right to instruct Master to utilise the vessel's maximum water ballast capacity and eventually to flood no 4 hold only, in order to bring down vessel's height to get into position under loading and/or discharging appliances, however, always in conformity to free board and/or safety requirements



## RIDER CLAUSES TO M.V. "KIND SEAS" CHARTER PARTY DATED 22ND DECEMBER 2006

Clause 65 – Agency Clause
Charterers agree to have their agents attend, if required by the Owners, to all Owners' matters, Owners in such case to refund agents' outlays and to pay them customary agency fee in full but normal ship's husbandry (immigration, crew mail, cash advance) which shall be taken care of by Charterers' agents without agency fee except the agency fee tariff valid for the respective port includes a general husbanding fee for the Owners Owners have the right of appointing and paying their own agents. No Owners' expenses to be advanced by Charterers Owners to put Master/agents in funds themselves No deduction from hire for same

Clause 66
All reference to time is understood to be in local time except delivery/redelivery times which are to be GMT

Clause 67 – Bill of Lading
If required the Charterers use their own Bill of Lading, with reference to lines 78/79 of the Charter Party, the Charterers and/or their agents are hereby authorised by the Owners to sign on Master's behalf all Bills of Lading as presented in accordance with Mate's Receipts without prejudice to this Charter Party, but the Charterers are to accept all consequences that might result from the Charterers and/or their agents not adhering to the remarks in Mate's and Tally Clerk's Receipts.

Clause 68 – BIMCO Double Banking

(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering

(b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this Clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do

(d) The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy

The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation

Clause 69
Deleted

Clause 70 – On/Off Hire Survey
Charterers to appoint a surveyor acting on their behalf for performing a joint on-and off-hire



## RIDER CLAUSES TO M.V. "KIND SEAS" CHARTER PARTY DATED 22ND DECEMBER 2006

bunker and condition survey. Joint on-hire survey to be in Owners' time only in so far as the survey hinders the vessel's operations performance at the time and joint off-hire survey to be in Charterers' time Expenses to be shared equally Owners to have the right to appoint the Master and/or Chief Engineer for the on-off hire survey.

Clause 71
Deleted

Clause 72 – Taxes/Dues
Any taxes and/or dues on the vessel, due to her flag and/or crew shall be for Owners' account. Any taxes and dues on cargo or freight or Charter hire to be for Charterers' account

Clause 73 - Arbitration
Any dispute arising under the Charter to be referred to arbitration in London, one arbitrator to be nominated by the Owners and the other by the Charterers and in case the arbitrators shall not agree then to the decision of an Umpire to be appointed by them, the award of the arbitrators or the Umpire to be final and binding upon both parties

If either of the appointed arbitrators refuses to act, or is incapable of acting, or dies, the party who appointed him may appoint a new arbitrator in his place

If one party fails to appoint an arbitrator, either originally or by way of substitution as aforesaid, for seven clear days after the other party having appointed his arbitrator, has served the party making default with notice to make the appointment, the party who has appointed an arbitrator may appoint that arbitrator to act as sole arbitrator in the reference and his award shall be binding on both parties as if he had been appointed by consent All arbitrators are to be conversant with shipping matters

This contract is governed in English Law and there shall apply to all proceeding under this Clause the terms of the London Maritime Arbitrators Association current at the time when the arbitration proceedings were commenced

All appointees shall be members of the Association (L M A A. Arbitration Clause)

Where the amount involved is less than US$ 100,000 00 the dispute or difference shall be referred to arbitration according to the L M A A Small Claims Procedure 1989

Clause 74
Watchmen, if required by Master, to be paid for by the Owners. If watchmen are compulsory, according to port registrations or required by Charterers, same to be for Charterers' account. If U S coast guard/U S immigrations/port authorities in United States, order/require security guards/watchmen due to vessel's crew, visa, nationality of the crew, same to be for Owners account If Owners have failed to satisfy U S immigrations/U S coast guards with visa requirements for the crew to enter the United States, the security guards to be for Owners' account

Clause 75
Charterers have the privilege of flying their own houseflag



RIDER CLAUSES TO M.V. "KIND SEAS"
CHARTER PARTY DATED 22ND DECEMBER 2006

Clause 76
The Charterers shall have the option to superficially inspect the vessel at any time during the period of the Charter Party and the Master/Officers and crew to render all necessary co-operation

Clause 77
Deleted

Clause 78 – Delivery Notices
The Owners give delivery notice to Charterers 15/10/5/3 days approximate and 24 hours definite notice

Clause 79
Owners to guarantee that the vessel has not traded to/from any C I S /ex U S S.R. Pacific ports within the last 12 months. Furthermore, Owners to guarantee that the vessel on delivery meets all Agricultural Canada Plant Protection Division and U S D A Plant Protection and Quarantine Office Regulations concerning the Asian Gypsy Moth

Furthermore Owners guarantee that the vessel is free of any Asian Gypsy Moth eggs or larvae or any form of Asian Gypsy Moth life

Should the vessel be found to have same, vessel to be considered off-hire until the vessel has been passed/cleared by Canadian/U.S authorities All costs, consequences, losses, damages including but not limited to loss of sale/purchase to be for Owners' account

Clause 80 – Vessel's Contact Details
Satellite communication on board: See Clause 29.A 29.)

Clause 81
Deleted

Clause 82
Deleted

Clause 83
Deleted

Clause 84
Managers on behalf of the Owners confirm that they have signed the Sea Carriers Initiative Agreement and that they will follow such rules

Clause 85
All cargo claims to be settled in accordance with Interclub Agreement as amended on September 1996 or any later amendments

Clause 86
This Charter Party to be interpreted in accordance with English Law English Law to apply

Clause 87
Owners guarantee vessel is not blacklisted by Richards Bay Coal Terminal



**RIDER CLAUSES TO M.V. "KIND SEAS"**
**CHARTER PARTY DATED 22ND DECEMBER 2006**

Clause 88 – I.T.F. - Bonafide
Vessel's officers/crew are covered for the duration of this Charter Party by an ITF agreement or equivalent

Clause 89 – L.O.I. Clause
Owners allow Charterers to discharge cargo without presentation of original Bill(s) of Lading against Charterers Letter of Indemnity The said Letter of Indemnity to be in accordance with Owners P and I Club wording, printed on Charterers company paper, signed by a person who legally binds Charterers company and a faxed copy of same being in Owners hands prior to vessel's arrival at destination In case of change of discharge port in Bill(s) of Lading, Owners to allow Charterers to discharge cargoes at new discharge port(s) and Charterers to provide Owners with Letter of Indemnity as per Owners P and I Club wording signed by Charterers only LOI to be sent to Owners for their approval prior vessel's arrival at the port Original one to be mailed to owners as soon as possible

Clause 90 – Mobile Cranes
Charterers at liberty to place mobile cranes on deck to facilitate discharge, all costs and time and risk to be for Charterers' account and sufficient Dunnage (if required by class or Master) to be placed underneath the cranes to spread the weight, which in any case not to exceed permissible deck strength Should any cutting or welding or reinforcement be necessary on railings or other deck fittings to accommodate the placement of such cranes on deck, then risk, expenses and time of such works to be for Charterers' account Charterers will be fully responsible for any and all damages, times, expenses and costs (including but not limited to all burnt paint on deck and underneath, normal wear and tear excepted) and that all works to be under Master/officers supervision and to classification societies and Masters' satisfaction Cutting or welding of hatch covers is strictly prohibited

Clause 91 – BIMCO Standard ISM Clause
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account

Clause 92
Deleted

Clause 93 – Fumigation Clause
If cargo is fumigated after loading on request of Charterers and/or Shippers and/or Receivers and vessel requested by fumigation company in writing stating number of days and/or time to elapse not to ventilate and not to enter fumigated cargo holds during sea voyage, then Owners not to be responsible for any cargo damage whatsoever as a result of fumigation of cargo and/or holds Any fumigation required to be in Charterers' time, risk and expense During fumigation, if allowed by port authorities/local regulations crew to remain on board If shore regulations/port authority/local regulations require crew to leave the vessel then any/all



## RIDER CLAUSES TO M.V. "KIND SEAS" CHARTER PARTY DATED 22ND DECEMBER 2006

expenses incurred for accommodation/victualling/transportation of the Crew to be for Charterers' account

**Clause 94 – B/L Splitting Clause**
Charterers and/or agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading which be handed over to the Owners or their representative prior issuing various delivery orders Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice Shipowners' rights

**Clause 95 -- Change of Ownership/Flag/Management**
The Owners shall have the liberty of selling the vessel and/or changing vessel's flag and/or changing vessel's management at any time during the course of this Charter Party It is agreed that such change of ownership and/or flag and/or management company shall not prejudice the terms and conditions of this Charter Party The Buyers will undertake to perform the balance period of this Charter Party at the same terms and conditions agreed Owners to give pre notice of 30 days with regards to any change of Ownership/ flag/ Management Company Change of ownership to be effected prior issuance of the Bill of Ladings and without to interfere with Charterers operations Before change management and/or flag Owners to notify Charterers 30 days in advance in order obtain Charterers approval which will not be unreasonably withheld. All the time lost and all directly related expenses including additional bunkers consumed in relation to such sale to be for Owners account

**Clause 96**
In case vessel trades in European EU waters the sulphur content of the MGO in use on vessel not to exceed 0,2 per cent otherwise Owners/Master/vessel not be held responsible for any consequences if any provided the vessel can always accept and segregate from other MGO on board

**Clause 97**
The BIMCO ISPS CLAUSE for time charter parties as well as the U S customs advance notification/AMS clause for time charter parties to be fully incorporated in this charter party

**Clause 98 – Japanese Seaway Bill Clause**
Charterers have an option to issue non-negotiable seaway bill in lieu of Bills of Lading in which case Charterers instruct Master to release cargo without Bills of Lading and L O I Charterers hereby agree to indemnify Owners/Master against any consequences arising therefrom However in order to avoid any discrepancies the Master will be supplied with copies of the relevant seaway bills latest prior to commencement of discharge This only applies when trading to Japan The goods shipped under the waybill should be delivered to the party named in the waybill against the waybill and against production of sufficient proof of identity to Master's/Owners' satisfaction

**Clause 99 – Routing/Performance Clause**
Charterers may supply independent weather bureau (weather news International or applied weather technologies or other) advice to the Master during voyages specified by the charterers The master is to comply with the reporting procedure of the routeing service selected by Charterers If, during the currency of the charter party, the speed of the vessel (as described and warranted in clause 29) be reduced and/or fuel oil consumption be increased, Charterers shall have the right to deduct from hire an amount equivalent to the time lost and/or cost of any extra fuels consumed Evidence of weather conditions to be taken from the



RIDER CLAUSES TO M.V. "KIND SEAS"
CHARTER PARTY DATED 22ND DECEMBER 2006

vessel's deck logs and independent weather bureau reports In the event of a consistent discrepancy between the deck logs and the daily weather reports from weather stations or independent bureau reports, then unless owners and charts reach an amicable agreement the dispute to be referred to arbitration

Clause 100 – Bunker Fuel Sulphur Content Clause for time charter parties 2005
(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a)

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency

Clause 101 – Dry Dock Break Clause
Vessel's next drydocking is due within Oct 2007 to April 2008 Owners inted to drydock the vessel in Feast or Atlantic for a period estimated to last about 20 days for which Charterers to bring the vessel to 1 sp Singapore/Japan range or Skaw/Passero range and deliver to Owner for drydock purposes

Vessel to be placed off-hire upon delivery last outward sea pilot one safe port Singapore/Japan range or Skaw/Passero range All fuel used by the vessel while off-hire shall be for Owners' account

Vessel shall be put back on hire at delivery last outward sea pilot dockyard or in Charterer's option at a position or max equivalent distance from last discharge port to the Charterers' next destination with Owners' giving 15/10/5/3/2/1 days notice to Charterers



RIDER CLAUSES TO M.V. "KIND SEAS"
CHARTER PARTY DATED 22ND DECEMBER 2006

Charterers have the right/option to add such off-hire to charter party period duration

Owners to notify Charterers 3 months in advance where and when drydock to be performed

Clause 102 – Underperformance / Overconsumption
If loss of speed is a result of Charterers 'trading itinerary causing dirty bottom with clear evidence then no claim to be made for loss of time and/or cost of extra expenses, as soon as possible after vessel is found to have decreased speed or excess fuel consumption
The term good weather conditions used herein shall mean conditions in which wind speed will not exceed force 4 on the Beaufort scale and sea Douglas State scale 3
This clause will only apply if vessel will remain at one port in tropical waters for over 30 consecutive days

****************

BOTH TO BLAME COLLISION CLAUSE
If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply :-

NEW BOTH TO BLAME COLLISION CLAUSE
If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier
The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to the colliding ships or objects are at fault in respect to a collision or contact
and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause

GENERAL PARAMOUNT CLAUSES
"In respect of all Bills of Lading issued under this Charter Party other than Bills of Lading to or from United States or from Canadian or United Kingdom ports, the Bills of Lading should contain the following clause:

All Bill of Lading issued under this Charter Party shall contain the following clause:

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by Sea which incorporates the rules relating to Bills of Lading contained in



RIDER CLAUSES TO M.V. "KIND SEAS" CHARTER PARTY DATED 22ND DECEMBER 2006

the International Convention, dated Brussels, 25th August 1924, and which is compulsorily applicable to the contract of carriage herein contained Such legislation shall be deemed to be incorporated herein but nothing herein contained shall be deemed a surrender by the Carriers of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder If any term of this Bill of Lading be repugnant to any extent to any legislation by this Clause incorporated, such term shall be void to that extent but no further Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from or limitation of liability "

NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which the carrier is not responsible by statute, contract or otherwise, the goods, Shippers, Consignees or Owners of the goods shall contribute with the carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said such salving ship or ships belonged to strangers

Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the carrier before delivery "
and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause

HAMBURG RULES CHARTERPARTY CLAUSE

Neither the Charterers nor their agents shall permit the issue of any Bill of Lading, waybill or other document evidencing a contract of carriage incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or hague/visby rules Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause

BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993
CODE NAME: "CONWARTIME 1993"

1 For the purpose of this Clause, the words:

a. "Owners" shall include the Shipowners, bareboat Charterers, Disponent Owners, managers or other operators who are charged with the management of the vessel and the Master and

b "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group or the government of any state whatsoever which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel



## RIDER CLAUSES TO M.V. "KIND SEAS" CHARTER PARTY DATED 22ND DECEMBER 2006

2 The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through any port, place, area or zone (whether of land or sea) or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to war risks. Should the vessel be within any such place as aforesaid which only becomes dangerous or is likely to be or to become dangerous after her entry into it, she shall be at liberty to leave it

3 The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels or is imposed selectively in any way whatsoever against vessels of certain flags or ownership or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent right of search and/or confiscation.

4

a. The Owners may effect war risks insurance in respect of the hull and machinery of the Vessel and their other interests (including, but not limited to loss of earnings and detention, the crew and their Protection and Indemnity risk), and the premiums and/or calls therefore shall be for their account

b If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within or is due to enter and remain within any area or areas which are specified by such underwriters as being subject to additional premiums because of war risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due

5 If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due

6. The Vessel shall have liberty:

a. To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any other way whatsoever which are given by the government of the Nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

b To comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

c To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;



## RIDER CLAUSES TO M.V. "KIND SEAS" CHARTER PARTY DATED 22ND DECEMBER 2006

d. To divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

e To divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions

7 If in accordance with their rights under the foregoing provisions of this Clause the Owners shall refuse to proceed to the loading or discharging ports or any one or more of them, they shall immediately inform the Charterers No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice

8 If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party

**ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005**

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code) If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA)

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO)

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners"*

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port



RIDER CLAUSES TO M.V. "KIND SEAS"
CHARTER PARTY DATED 22ND DECEMBER 2006

facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party

U.S. CUSTOMS ADVANCE NOTIFICATION/AMS CLAUSE FOR TIME CHARTER PARTIES

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4 7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carriers Alpha Code)
ii) Have in place an ICB (International Carrier Bond)
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited o legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a) Should suchfailure result in any delay then, notwithstanding any provision in this charter Party to the contrary, the Vessel shall remain on hire
(c) If the charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts
(d) The assumption of the role of carriers by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation

OWNERS

BY AUTHORITY OF DISP OWNERS
FOR AND ON B[illegible]
CURZON MA[illegible] LTD
AS AGENTS ONLY

CHARTERERS

# EXHIBIT B

NORDEN TO ESTC

**Final hire statement**

Vessel: Kind Seas
C/P date: 22/12/06
HeadFixture: HF01006

Issued 10/06/09
By: msg

| | | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| Delivery: | | 02/02/07 | 14:33 UCT | | | |
| Redelivery | | 16/01/09 | 00:01 UCT | | | |
| Duration: | | 713.39444 days @ | USD | 25,500.00 | | $18,191,558.33 |
| | 2.50% Address commission | | | | $454,788.96 | |
| | 1.25% Broker commission | | | | $227,394.48 | |
| ILOHC | | | | | $5,000.00 | |
| BOD | FO: | 1,614.314 MT @ USD | 340 pmt | | | $548,866.76 |
| | DO: | 48.569 MT @ USD | 613 pmt | | | $29,772.80 |
| BOR | FO: | 1,451.550 MT @ USD | 340 pmt | | $493,527.00 | |
| | DO: | 45.800 MT @ USD | 613 pmt | | $28,075.40 | |
| C/V/E: | | $1,250.00 per month | 713.394 days | | | $29,317.26 |
| **Offhire:** | | | | | | |
| Total duration | | 41.95208 days @ | USD | 25,500.00 | $1,069,778.12 | |
| | FO: | 134.105 MT @ USD | 340 pmt | | $45,595.70 | |
| | DO: | 19.770 MT @ USD | 613 pmt | | $12,119.01 | |
| Commission | | 3.750% | | | | $40,116.68 |
| C/V/E | | $1,250.00 per month | 41.952 days | | $1,724.04 | |
| **Charterers expenses:** | | | | | | |
| Intermed. cl. after Huangpu - Fix 9413 - voy 2 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. after Rotterdam - Fix 9413 - voy 2 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. after Gijon - Fix 9413 - voy 2 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. after Busan - Fix 9413 - voy 2 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. after Dunkirk - Fix 9413 - voy 02 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. after Qinhuangdao - Fix 9413 - voy 2 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. after Chiwan - Fix 9413 - voy 02 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. after Rizhao - Fix 9413 - voy 02 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. after Hong Kong - Fix 9413 - voy 02 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. after Dangjin - Fix 9413 - voy 2 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. afterNagoya - Fix 10065 - voy 3 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. after Porto Vesme - Fix 10065 - voy 4 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Intermed. cl. after Aughinish - Fix 11708 - voy 5 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| Stevedore damage Aughinish - fix 11708 | | | | | | $300.00 |
| Intermed. cl. after Ensted - fix 10065 - voy 03 - 7 holds at USD 500.- | | | | | | $3,500.00 |
| **Owners' expenses:** | | | | | | |
| Owners' actual share of on-hire survey - 50% of USD 800.- - Fix 9320 - Voy 01 | | | | | $400.00 | |
| Actual owners' expenses Hibikanada - 11.02.07 - Incl. 2.5% outlay commission | | | | | $34.95 | |
| O/E at Xingang (Tianjin) 04-02-07 - 07-02-07 F09320 | | | | | $60.75 | |
| Extra tugboat Nagoya | | | | | $800.00 | |
| O/E at Portbury 03-01-09 - 16-01-09 F10065 | | | | | $799.45 | |
| Compensation for bunkers debunkered at Singapore | | | | | $179,462.86 | |
| Estimated Owners expenses | | | | | | $10,000.00 |
| Total hire remitted | | | | | $17,338,662.92 | |
| Total | | | | | $19,858,223.84 | $18,898,931.93 |
| Due to | NORDEN | | | | | $959,291.81 |
| | | | | | $19,858,223.84 | $19,858,223.84 |

4100

E&OE

| Date | Description | Amount |
|---|---|---|
| 02-02-2007 | 1st Hire Statement | -946,977,24 |
| 17-02-2007 | 2nd Hire Statement | -367.207,70 |
| 04-03-2007 | 3rd Hire Statement | -368.772,69 |
| 19-03-2007 | 4th Hire Statement | -368.337,74 |
| 03-04-2007 | 5th Hire Statement | -368.711,94 |
| 18-04-2007 | 6th Hire Statement | -368.772,69 |
| 03-05-2007 | 7th Hire Statement | -368.772,69 |
| 18-05-2007 | 8th Hire Statement | -368.772,69 |
| 02-06-2007 | 9th Hire Statement | -368.772,69 |
| 17-06-2007 | 10th Hire Statement | -368.772,69 |
| 02-07-2007 | 11th Hire Statement | -368.772,67 |
| 17-07-2007 | 12th Hire Statement | -368.772,69 |
| 01-08-2007 | 13th Hire Statement | -368.772,69 |
| 16-08-2007 | 14th Hire Statement | -368.772,69 |
| 31-08-2007 | 15th Hire Statement | -368.772,69 |
| 15-09-2007 | 16th Hire Statement | -368.772,69 |
| 30-09-2007 | 17th Hire Statement | -128.175,47 |
| 15-10-2007 | 18th Hire Statement | -240.597,22 |
| 15-10-2007 | 19th Hire Statement | -368.772,69 |
| 30-10-2007 | Bunkers paid to owns - 20 th hire stmt | -225.946,95 |
| 14-11-2007 | 22nd Hire Statement | -186.093,92 |
| 29-11-2007 | 23rd Hire Statement | -368.772,69 |
| 14-12-2007 | 24th Hire Statement | -368.772,69 |
| 29-12-2007 | 25th Hire Statement | -368.772,69 |
| 13-01-2008 | 26th Hire Statement | -372.272,69 |
| 28-01-2008 | 27th Hire Statement | -368.772,69 |
| 12-02-2008 | 27th Hire Statement | -368.772,69 |
| 27-02-2008 | 28th Hire Statement | -314.481,41 |
| 13-03-2008 | 29th Hire Statement | -368.772,69 |
| 28-03-2008 | 30th Hire Statement | -372.272,69 |
| 12-04-2008 | 31st Hire Statement | -368.772,69 |
| 27-04-2008 | 32nd Hire Statement | -372.272,69 |
| 12-05-2008 | 33rd Hire Statement | -368.772,69 |
| 27-05-2008 | 34th Hire Statement | -350.806,49 |
| 11-06-2008 | 35th Hire Statement | -37.466,20 |
| 11-06-2008 | 36th Hire Statement | -372.272,69 |
| 26-06-2008 | 37th Hire Statement | -368.772,69 |
| 11-07-2008 | 38th Hire Statement | -368.772,69 |
| 26-07-2008 | 40th hire statement | -371.980,04 |
| 10-08-2008 | 41st hire statement | -368.265,34 |
| 25-08-2008 | 42nd hire statement | -368.772,69 |
| 09-09-2008 | 43th hire statement | -368.772,69 |
| 24-09-2008 | 44th hire statement | -368.772,69 |
| 09-10-2008 | 45th hire statement | -375.772,69 |
| 24-10-2008 | 46th Hire Statement | -368.772,69 |
| 08-11-2008 | 47th Hire Statement | -369.072,69 |
| 23-11-2008 | 48th hire Statement | -372.272,69 |
| 08-12-2008 | 49th Hire Statement | -368.772,69 |
| 23-12-2008 | 50th Hire Statement | -129.771,13 |
| | **Total** | **17.338.662,92** |

## Off-Hire Statement

| | | | |
|---|---|---|---|
| Vessel: | Kind Seas | Issued: | 10/06/09 |
| C/P date: | 22/12/06 | By: | msg |
| Headfixture: | HF01006 | | |

| | | | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|---|---|
| Engine Breakdown, drifting in Atlantic | | | | | | | |
| Off-hire from: | | 22/07/07 | 08:42 GMT | | | | |
| Off-hire to: | | 26/07/07 | 00:00 GMT | | | | |
| Off-hire duration: | | 3.637 days @ | USD | | 25,500.00 | $92,756.25 | |
| | 2.50% commission Address | | | | | | $2,318.91 |
| | 1.25% Commission Broker | | | | | | $1,159.45 |
| Bunkers used during off-hire: | | | | | | | |
| BOD | FO: | 11.810 MT @ USD | | 340 pmt | | $4,015.40 | |
| | DO: | 0.000 MT @ USD | | 613 pmt | | $0.00 | |
| CVE | | 3.637 days @ | USD | | $1,250.00 | $149.48 | |
| Total | | | | | | $96,921.13 | $3,478.36 |
| Due to | NORDEN | | | | | | $93,442.76 |
| | | | | | | $96,921.13 | $96,921.13 |

E&O E

## Off-Hire Statement

Vessel: Kind Seas
C/P date: 22/12/06
Headfixture: HF01006

| Issued: | 10/06/09 |
|---|---|
| By: | msg |

| | | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| **Engine Breakdown, New Orleans** | | | | | | |
| Off-hire from: | | 06/08/07 | 19:40 GMT | | | |
| Off-hire to: | | 08/08/07 | 20:57 GMT | | | |
| Off-hire duration: | | 2.053 days @ | USD | 25,500.00 | $52,363.54 | |
| | 2.50% commission Address | | | | | $1,309.09 |
| | 1.25% Commission Broker | | | | | $654.54 |
| Bunkers used during off-hire: | | | | | | |
| BOD | FO: | 3.500 MT @ USD | | 340 pmt | $1,190.00 | |
| | DO: | 2.730 MT @ USD | | 613 pmt | $1,673.49 | |
| CVE | | 2.053 days @ | USD | $1,250.00 | $84.39 | |
| Total | | | | | $55,311.42 | $1,963.63 |
| Due to | NORDEN | | | | | $53,347.79 |
| | | | | | $55,311.42 | $55,311.42 |

E&O E

## Off-Hire Statement

| | | | |
|---|---|---|---|
| Vessel: | Kind Seas | Issued: | 10/06/09 |
| C/P date: | 22/12/06 | By: | msg |
| Headfixture: | HF01006 | | |

| | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|
| **Deviation to Honolulu** | | | | | |
| Off-hire duration: | 3.000 days @ | USD | 25,500.00 | $76,500.00 | |
| 2.50% commission Address | | | | | $1,912.50 |
| 1.25% Commission Broker | | | | | $956.25 |
| Bunkers used during off-hire: | | | | | |
| BOD FO: | 69.000 MT @ USD | | 340 pmt | $23,460.00 | |
| DO: | 0.000 MT @ USD | | 613 pmt | $0.00 | |
| CVE | 3.000 days @ | USD | $1,250.00 | $123.29 | |
| Total | | | | $100,083.29 | $2,868.75 |
| Due to | NORDEN | | | | $97,214.54 |
| | | | | $100,083.29 | $100,083.29 |

E&O E

## Off-Hire Statement

| | | | |
|---|---|---|---|
| Vessel: | Kind Seas | Issued: | 10/06/09 |
| C/P date: | 22/12/06 | By: | msg |
| Headfixture: | HF01006 | | |

| | | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| **Drydocking** | | | | | | |
| Off-hire from: | 29/09/07 | 21:48 GMT | | | | |
| Off-hire to: | 24/10/07 | 01:48 GMT | | | | |
| Off-hire duration: | 24.165 days @ | USD | | 25,500.00 | $616,214.58 | |
| 2.50% commission Address | | | | | | $15,405.36 |
| 1.25% Commission Broker | | | | | | $7,702.68 |
| Bunkers used during off-hire: | | | | | | |
| BOD FO: | 10.300 MT @ USD | | 340 pmt | | $3,502.00 | |
| DO: | 9.840 MT @ USD | | 613 pmt | | $6,031.92 | |
| CVE | 24.165 days @ | USD | | $1,250.00 | $993.08 | |
| Total | | | | | $626,741.59 | $23,108.05 |
| Due to | NORDEN | | | | | $603,633.54 |
| | | | | | $626,741.59 | $626,741.59 |

E&O E

## Off-Hire Statement

| | | | | | |
|---|---|---|---|---|---|
| Vessel: | Kind Seas | | | Issued: | 10/06/09 |
| C/P date: | 22/12/06 | | | By: | msg |
| Headfixture: | HF01006 | | | | |

| | | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| **Temporary repair at Balboa** | | | | | | |
| Off-hire from: | 19/08/07 | 01:18 GMT | | | | |
| Off-hire to: | 23/08/07 | 21:00 GMT | | | | |
| Off-hire duration: | 4.821 days @ | USD | | 25,500.00 | $122,931.25 | |
| | 2.50% commission Address | | | | | $3,073.28 |
| | 1.25% Commission Broker | | | | | $1,536.64 |
| Bunkers used during off-hire: | | | | | | |
| BOD | FO: | 4.780 MT @ USD | | 340 pmt | $1,625.20 | |
| | DO: | 7.200 MT @ USD | | 613 pmt | $4,413.60 | |
| CVE | | 4.821 days @ | USD | $1,250.00 | $198.11 | |
| Total | | | | | $129,168.16 | $4,609.92 |
| Due to | NORDEN | | | | | $124,558.24 |
| | | | | | $129,168.16 | $129,168.16 |

E&O E

## Off-Hire Statement

| | | | |
|---|---|---|---|
| Vessel: | Kind Seas | Issued: | 10/06/09 |
| C/P date: | 22/12/06 | By: | msg |
| Headfixture: | HF01006 | | |

| | | | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|---|---|
| **Debunkering at Singapore** | | | | | | | |
| Off-hire from: | | 08/11/07 | 18:00 GMT | | | | |
| Off-hire to: | | 12/11/07 | 08:06 GMT | | | | |
| Off-hire duration: | | 3.588 days @ | USD | | 25,500.00 | $91,481.25 | |
| | 2.50% commission Address | | | | | | $2,287.03 |
| | 1.25% Commission Broker | | | | | | $1,143.52 |
| Bunkers used during off-hire: | | | | | | | |
| BOD | FO: | 10.997 MT @ USD | | 340 pmt | | $3,738.98 | |
| | DO: | 0.000 MT @ USD | | 613 pmt | | $0.00 | |
| CVE | | 3.588 days @ | USD | | $1,250.00 | $147.43 | |
| Total | | | | | | $95,367.66 | $3,430.55 |
| Due to | NORDEN | | | | | | $91,937.11 |
| | | | | | | $95,367.66 | $95,367.66 |

E&O E

## Off-Hire Statement

Vessel: Kind Seas
C/P date: 22/12/06
Headfixture: HF01006

| Issued: | 10/06/09 |
|---|---|
| By: | msg |

| | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|
| **Deviation between Qingdao and Xingang** | | | | | |
| Off-hire duration: | 0.6875 days @ | USD | 25,500.00 | $17,531.25 | |
| 2.50% commission Address | | | | | $438.28 |
| 1.25% Commission Broker | | | | | $219.14 |
| Bunkers used during off-hire: | | | | | |
| BOD FO: | 23.718 MT @ USD | | 340 pmt | $8,064.12 | |
| DO: | 0.000 MT @ USD | | 613 pmt | $0.00 | |
| CVE | 0.6875 days @ | USD | $1,250.00 | $28.25 | |
| Total | | | | $25,623.62 | $657.42 |
| Due to | NORDEN | | | | $24,966.20 |
| | | | | $25,623.62 | $25,623.62 |

E&OE

## Off-Hire Statement

Vessel: Kind Seas
C/P date: 22/12/06
Headfixture: HF01006

Issued: 10/06/09
By: msg

| Total off hire | | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| Off-hire duration: | | 41.9521 days @ | USD | 25,500.00 | $1,069,778.12 | |
| | 2.50% commission Address | | | | | $26,744.45 |
| | 1.25% Commission Broker | | | | | $13,372.23 |
| Bunkers used during off-hire: | | | | | | |
| BOD | FO: | 134.105 MT @ USD | | 340 pmt | $45,595.70 | |
| | DO: | 19.770 MT @ USD | | 613 pmt | $12,119.01 | |
| CVE | | 41.9521 days @ | USD | $1,250.00 | $1,724.04 | |
| Total | | | | | $1,129,216.87 | $40,116.68 |
| Due to | NORDEN | | | | | $1,089,100.19 |
| | | | | | $1,129,216.87 | $1,129,216.87 |

E&O E